UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 07-MJ-258-AK |
| | : | |
| v. | : | VIOLATIONS: 18 U.S.C. § 1038 |
| | : | (False Information and Hoaxes) |
| CHRISTOPHER ORLOSKI | : | |
| Defendant. | : | |

### GOVERNMENT'S BRIEF IN SUPPORT OF ITS REQUEST FOR AN ORDER TO INVOLUNTARY MEDICATE THE DEFENDANT TO RESTORE HIS COMPETENCY FOR TRIAL

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby requests that the Court order the defendant to submit to the involuntary administration of antipsychotic medications, consistent with Supreme Court's decision in Sell v. United States, 539 U.S. 166 (2003). In support of this request, the government states as follows:

**I.    Background**

    **A.    Nature Of Charge And Arrest[1]**

On May 27, 2007, at approximately 1:30 p.m., officers of the United States Capitol Police (USCP) were conducting a security sweep of the United States Capitol grounds in preparation for a Memorial Day concert later that evening. A USCP officer discovered a Deer Park-brand water bottle, one half-liter in size and containing a clear liquid, on the concrete in the Grotto area of the United States Capitol grounds. The Grotto is located on the west front of the United States Capitol near the Senate air shaft. The words "for U.S. defense" were handwritten on the label of the water bottle. The same words were handwritten on the clear part of the bottle.

---

[1] The description of Mr. Orloski's actions giving rise to his arrest and the charge before the Court is taken from the Amended Complaint, dated June 1, 2007.

The USCP officer found approximately 17 loose sheets of paper in a pile next to the water bottle. The top sheet of paper consisted of a black-and-white photocopy of three keys with handwriting above the keys. Two of the keys appeared to be Architect of the Capitol (AOC) Medico keys. The serial number for one of the AOC Medico keys was legible in the photocopy and corresponded with the master key for all telecommunication closets in the Senate Hart office building. The handwriting above the depiction of the keys appeared to refer to the travel schedule of two CSX trains and various items transported on the trains, with a reference to "CHLORINE."

A second sheet of paper consisted of the printout of an email containing a threat to release chlorine gas in Washington, D.C. The subject heading in the email stated: "Cloreen [sic] to visit U.S. Capitol." The body of the email stated: "I am going to release Cloreen [sic] in DC. What u tink about dat, asswhips?" The email was addressed to an employee at the United States Defense Intelligence Agency (DIA). The remaining papers contained numerous references to "chlorine" or "Cloreen" and to Christopher Orloski.

Also, on May 27, at approximately 1:30 p.m., a citizen found two United States Postal Service Priority Mail envelopes on the concrete near Grant's statue on the United States Capitol grounds, and provided the envelopes to a uniformed USCP officer. One of the envelopes had handwriting on the outside. That handwriting stated: "Go to the grotto fountain for the complete details on the U.S. Senate Thanks." The envelope without handwriting on the outside contained numerous papers. One of the papers appeared to be the resume of a Christopher Orloski. Another papered appeared to be a letter from "Chris." The letter, dated May 20, 2007, was addressed as follows: "To all in the family." The letter contained the statement: "There is also a

reason why I captured the U.S. Senate's keys and gave them to the Islamic Republic of ******** in 2007." The letter also contained a reference to "making the Seung-Hui Cho Virginia Tech event look like a cribling using a plaything."

In response to this threat, the USCP established a perimeter around the scene and called for its Hazardous Devices Unit to arrive. The Hazardous Devices Unit tested the water bottle and its contents for explosives and chemicals on the scene. The water bottle and its contents were determined not to be hazardous.

On May 31, 2007, at approximately 2:30 a.m., USCP officers found Christopher Orloski sleeping outside on the United States Capitol grounds. A USCP detective interviewed Mr. Orloski soon afterward, and Mr. Orloski admitted that he had left the papers at the Grotto as a "test" for tourists.

Mr. Orloski was subsequently arrested and charged with a violation of 18 U.S.C. § 1038.

B.   **Post-Arrest Procedural History**

Following the defendant's arrangement and, by order dated June 11, 2007, this Court ordered competency restoration and treatment, pursuant to 18 U.S.C. § 4241. On July 2, 2007, Mr. Orloski was admitted to the Mental Health Department of the Federal Medical Center (FMC) in Butner, North Carolina.

Since Mr. Orloski arrived at FMC-Butner, Mr. Orloski was seen individually by Jason Cohen, M.A., Psychological Intern, and supervised by Carlton Pyant, Ph.D, Staff Psychologist. Psychiatric consultation was provided by Mark Cheltenham, M.D., Staff Psychiatrist. Report at

2.² Other members of the FMC-Butner forensic team, correctional, and mental health staff also had the opportunity to observe Mr. Orloski since his arrival. Id. Assessment procedures were conducted for Mr. Orloski's evaluation, including clinical interviews, behavioral observations, and a July 2, 2007 physical examination.

The staff at FMC-Butner believed that, through the evaluative process, Mr. Orloski was uncooperative, guarded, and self righteous. Report at 5. During interpersonal encounters, Mr. Orloski was also argumentative and antagonistic. Id. The most prominent and striking feature of his presentation stemmed from his delusional belief system. Id. The staff felt that the delusions to which he subscribes are the defining characteristic of Mr. Orloski and drive much of his behavior. Id.

In particular, Mr. Orloski believes that he is some type of covert operative, currently held as an enemy combatant and the subject of a multi-national and multi-agency conspiracy. Id.; TR at 17, 26, 37. Mr. Orloski strongly believed that there was a political conspiracy against him that involved the utilization of a host of United States governmental officials and departments. He reported the existence of a "political agenda operating" for charging him with "communicating threats to use chemical weapons against the United States Senate." Report at 7.

Over the course of his hospitalization, Mr. Orloski became increasingly angry with Dr. Pyant. Report at 8. His discontentment commenced shortly after Dr. Pyant and other evaluators communicated that they believed he was mentally ill and recommended his treatment with

---

² "Report at ___" refers to the page number of the November 19, 2007 report prepared by the medical staff of FMC-Butner in response to the Court's request for a competency restoration study of Mr. Orloski. This Report was admitted as evidence during the hearing held by the Court on January 29, 2007, to address the Government's request to involuntary medicated the defendant. Hearing Transcript at page 4 (subsequently cited, herein, as "TR at ___").

psychotropic medication. Report at 8-9, TR at 38. Mr. Orloski initially began refusing communication with team members, especially if Dr. Pyant was present. Report at 9. He modified this strategy and began conveying intense hostility towards Dr. Pyant via sarcasm, questioning his professionalism and credentials, speaking with his superiors and communicating vague threats of harm. Id. Mr. Orloski avoided making direct threats. Id. He usually insinuated plans to utilize his purported connections with powerful people and organizations to influence or command acts of aggression against specific individuals. Id.

With the passage of time, Mr. Orloski's psychological symptoms worsened. Behaviorally, he began following his peers around the unit and initiating contact with them, only to verbally insult or disparage them. Id. The unit officer reported an increasing number of his peers expressing an intent to assault Mr. Orloski if he continued this aggressive behavior. Id. In addition, on October 27, 2007, Mr. Orloski directly confronted Dr. Pyant. Id. Upon making eye contact with Dr. Pyant, Mr. Orloski stated, "we are going to do things my way." Id. Mr. Orloski continued to prevent Dr. Pyant from continuing and failed to comply with Dr. Pyant's instruction for him to return to his unit. Id. Dr. Pyant ultimately was required to contact a unit officer to ensure his safety. Id. Following this incident on October 27, Mr. Orloski was removed from open population at FMC-Butner, and placed in a single cell, restricted movement housing unit, where he is required to be inside of his cell for 23 hours a day. Id.; TR at 13.

On November 19, 2007, a report was issued by FMC-Butner – which was signed by Mr. Cohen, Dr. Pyant, and Dr. Cheltenham – opining that Mr. Orloski was not competent to proceed to trial and that he should be involuntary medicated with psychotropic medications to restore his competency to proceed to trial, consistent with the Supreme Court's decision in Sell v. United

States. Report at 20-21. The conclusions in this Report were based on the totality of the observations and evaluations by the FMC-Butner personnel of Mr. Orloski and documents relating to Mr. Orloski. Report at 1-2.

On January 29, 2008, a hearing was held before this Court on the Government's request for the Court to issue an order for the defendant to submit to the involuntary administration of antipsychotic medications to restore his competency. At this hearing, Drs. Pyant and Cheltenham testified for the Government and were qualified as experts in their respective fields of forensic psychology and psychiatry. TR at 6, 43. Mr. Orloski testified on his own behalf, without cross-examination. TR at 65. Following this hearing, this Court requested briefing from both parties to address the involuntary medication of Mr. Orloski. TR at 76.

**II.    The Defendant Has Been Diagnosed As Having Delusional Disorder And This Disorder Has Rendered The Defendant Currently Incompetent To Stand Trial**

**A.    The Defendant Has Been Diagnosed As Having Delusional Disorder**

The Report states that Mr. Orloski meets diagnostic criteria for Delusional Disorder. Report at 10. The Report explains that, according to the Diagnostic and Statistical Manuel of Mental Disorders, Fourth Edition, Tex Revision (DSM-IV-TR), a delusion is "a false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary. The belief is not one ordinarily accepted by other members of the person's culture or subculture (e.g., it is not an article of religious faith)." Id.

The Report further explains that Mr. Orloski falsely believes he is a covert operative employed by the DIA. Report at 10. Although he has been presented with insurmountable

evidence that is contrary to his belief, including being informed by several mental health professionals that he is mentally ill, and has been arrested, charged, and incarcerated by the very government he claims sanctions his actions, he has not altered his beliefs.  Id.  Rather, he has adapted his delusion to incorporate this incongruent information, and currently believes that his incarceration is simply a new mission.  Id.

The Report states that the reviewed evidence indicates that Mr. Orloski has been delusional since January 2007 and, based on the typical onset of this disorder, was likely symptomatic even earlier.

### B. The Defendant's Severe Mental Illness Has Rendered Him Currently Incompetent To Stand Trial

Given the defendant's severe mental illness, the Report concludes that Mr. Orloski's rational understanding of the proceedings against him is seriously flawed and he is currently incompetent to stand trial.  Report at 12-13, TR at 25, 27, 39.  The Report explains that Mr. Orloski's Delusional Disorder has rendered him unable to appreciate the nature and consequences of the proceedings filed against him and unable to work with an attorney in his defense.  Report at 13.[3]

The Report clarifies that Mr. Orloski believes that the charges against him are the result of a grand scale governmental conspiracy, and he is a covert operative, acting in a government sanctioned, occupational capacity, and therefore, exempt from legal proceedings.  Id.  He also believes the proceedings are a retaliation from the United States Department of Justice for filing

---

[3] The Report indicates, however, that Mr. Orloski has a sufficient factual knowledge of the proceedings against him.  Report at 12.  In general, he understands plea options and personnel involved in the judicial process, including the judge, jury, defense attorney, prosecutor and witness.  Id.  He also expressed an understanding of various pleas and verdicts.  Id.

a lawsuit, and believes his current situation serves only to confirm the allegations he raised in the lawsuit.  Id.  Although Mr. Orloski understands the adversarial nature of the courtroom, he believes the United States Attorney General is unethical and will contrive allegations.  Id.  Accordingly, the Report opines that Mr. Orloski has paranoid delusions which preclude him from rationally applying factual knowledge to his case.  Id.

The Report further states that Mr. Orloski has made it abundantly clear he does not feel his attorney can defend him or even wants to try.  Report at 13.  Paranoid delusions cause Mr. Orloski to believe his attorney is part of the conspiracy against him, and Mr. Orloski is not willing to discuss any details relevant to his case due to the secretive nature of "covert operations."[4]  Report at 13, TR at 18, 26.  Mr. Orloski also will not discuss alternative defense strategies with his attorney, and does not plan on having his attorney represent him and intends to represent himself.  Report at 13.  On more than one occasion, he explained that his lawyer would not be able to defend him and had "malice" intentions.  Id.  On October 11, 2007, Mr. Orloski stated his lawyer was aware of the "political agenda" operating against him and sent him to be evaluated rather than lose the case.  He stated that his lawyer's motivation is not to help him but strictly financial compensation and maintenance of his "win versus loss record in court."  According to Mr. Orloski, his case is "undefendable" because orders have come down from the top and everyone involved in his case takes orders from someone.

**III.    Consistent With The Supreme Court's Decision In <u>Sell</u>, Mr. Orloski Should Be Involuntary Medicated To Restore His Competency For Trial**

---

[4] Although Mr. Orloski asserted at the January 29 hearing that he believes he would be able to assist his attorney in preparing a defense (TR at 67), there was no discussion of how or why Mr. Orloski was able to change his prior, strongly-held beliefs regarding his attorney, especially in the absence of any medical treatment.

**A.    The Forensic Report Indicates, Given Mr. Orloski's Current State Of Restriction, He Does Not Pose A Danger To Himself, Others, Or Property Sufficient To Meet The Dangerousness Criteria Of <u>Harper</u> And The Government Does Not Contest That Determination For Purposes Of This Hearing**

In <u>Sell</u>, the Supreme Court instructs that the first step in ascertaining the appropriateness of involuntary medication is an assessment of whether or not the defendant is a danger to himself or others.

> There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question. For one thing, the inquiry into whether medication is permissible, say, to render an individual nondangerous is usually more "objective and manageable" than the inquiry into whether medication is permissible to render a defendant competent.

<u>Sell</u>, 539 U.S. at 182 (emphasis in the original) (<u>citing</u> <u>Riggins v. Nevada</u>, 504 U.S. 127, 140 (1992) (Kennedy, J., concurring in judgment)). The Supreme Court further explained that in those cases involving dangerous defendants, – that is, those defendants whose "failure to accept treatment threatens injury to the patient or others" (<u>id</u>., <u>citing</u> 18 U.S.C. § 4246), "the need to consider authorization on trial competence grounds will likely disappear." <u>Id</u>. at 183.

The government recognizes that the Report indicates Mr. Orloski does not pose a danger to himself, others or property – given his current state of restriction – sufficient to meet the criteria of <u>Washington v. Harper,</u> 494 U.S. 210 (1990), which would allow the Government to use medically appropriate antipsychotic drugs to reduce that danger. Report at 14, 20. The Report explains that Mr. Orloski has been housed on the open population for the majority of his hospitalization. Report at 14. In addition, although his recent threats against staff have resulted in his placement in restricted housing, Mr. Orloski has continued to manage his personal hygiene

without assistance, and maintains adequate nutritional practices.  Id.  His delusional beliefs have not impacted his physical health, nor is he considered to be gravely disabled secondary to medical or psychiatric pathology."  Id.

For purposes of this hearing, the United States does not contest the Report's conclusion that Mr. Orloski does not meet the criteria set forth in Harper necessary to justify involuntary medication.

> **B.    Consistent With The Supreme Court's Decision In Sell, Mr. Orloski Should Be Involuntary Medicated To Restore His Competency For Trial**

The United States Court of Appeals for the District of Columbia Circuit has held that a criminal defendant's due process liberty interest in avoiding unwanted antipsychotic medication is not absolute.  See United States v. Weston, 255 F.3d 873, 876 (citing Kansas v. Hendricks, 521 U.S. 346, 356 (1997)).  The defendant's interest can be substantially outweighed by compelling governmental interests, including the "essential government policies" of preventing and punishing criminality.  Id. at 880 (citing Schall v. Martin, 467 U.S. 253, 264 (1984)).  As the Weston II concurrence enunciated it:

> [t]o allow the government forcibly to medicate a defendant prior to trial with antipsychotic drugs, the district court must find that: (1) an "essential state policy" is at issue, (2) "treatment with antipsychotic medication [is] medically appropriate and, considering less intrusive alternatives, essential for the sake of [the defendant's] own safety or the safety of others," or essential to enable an adjudication of the defendant's guilt or innocence; and (3) the defendant's due process rights are protected."

Id. at 888 (Rogers, J., concurring) (citing Riggins, 504 U.S. at 135-38 ).  Generally, the government must show that in the opinion of medical experts, the proposed treatment and medications are "medically appropriate," and that the "potential side effects [are] manageable."

Id. at 877.

Subsequent to the D.C. Circuit's analysis in Weston, the Supreme Court examined the issue of involuntary medication in the context of non-dangerous defendants in Sell, 539 U.S. 166. Looking to the more narrow issue of whether trial competence *alone* justifies involuntary medication, the Supreme Court found that here, too, under appropriate circumstances, a defendant's right to resist medication can be outweighed by the government's interest in prosecuting the perpetrators of crime. Id. at 180 (quoting Illinois v. Allen, 397 U.S. 337, 347 (1970) (Brennan, J., concurring) ("[P]ower to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace").

To render a defendant just competent for trial, as opposed to "nondangerous", the Supreme Court in Sell set forth the following standards. As an initial matter, the court must find that *important* governmental interests are at stake. Sell, 539 U.S. at 180. This element is satisfied where the defendant is charged with a serious crime against a person or against property, because "[i]n both instances the Government seeks to protect through the application of the criminal law the basic human need for security." Id. Where a trial court first finds this important governmental interest, the Supreme Court directed that it then examine how that interest is furthered by the involuntary administration of medication:

> Second, the court must conclude that involuntary medication will *significantly further* [the] state interests. It must find that the administration of the drugs is substantially likely to render the defendant competent to stand trial [and] is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.
>
> Third, the court must conclude that involuntary medication is

> *necessary* to further [the state interest]. The court must find that alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .
>
> Fourth, . . . the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition.

Sell, 539 U.S. 180-183 (emphasis in original) (citations omitted).

As discussed below, the Government has met this requisite 4-prong standard to justify the involuntary medication of Mr. Orloski to restore his competency for trial.

    **1.    Important Governmental Interests Are At Stake In Bringing To Trial Mr. Orloski Who Is Accused Of A Serious Crime**

Mr. Orloski is charged with committing a dangerous felony offense — providing false information and perpetrating a hoax in violation of 18 U.S.C. § 1038. As discussed above in section I.A., Mr. Orloski knowingly and wilfully disseminated false and/or misleading information on the United States Capitol grounds where such information could reasonably be believed and where such information indicated that an activity has taken, is taking or will take place relating to the release of harmful chlorine gas. Indeed, the significant nature of this incident – the possible release of chlorine gas on the United States Capitol grounds close to the United States Senate air shaft – caused the USCP to establish a perimeter around the scene and to call for its Hazardous Device Unit. As a result, the defendant is currently charged with a serious crime – a violation of 18 U.S.C. § 1038, consistent with the Government's efforts to "protect through the application of the criminal law the basic human need for security." Sell, 539 U.S. at 180; see also Weston, 255 F.3d at 880 ("Preventing and punishing criminality are essential government policies").

In addition, because a violation of 18 U.S.C. § 1038 is punishable by up to five years in prison, Mr. Orloski faces a significant potential maximum sentence, which further demonstrates that the crime is "serious" for involuntary medication purposes. See United States v. Evans, 404 F.3d 227, 237 (4th Cir. 2005) (focusing on the maximum penalty authorized by statute in determining if a crime is "serious" in the context of an involuntary medication determination); see also Duncan v. Louisiana, 391 U.S. 145, 158 (1968) (observing that the Sixth Amendment's right to trial by jury exists only in "serious" criminal cases).

> 2. **Treatment Is Substantially Likely To Restore The Defendant To Competency And Is Substantially Unlikely To Have Side Effects That Will Interfere Significantly With the Defendant's Ability To Assist His Counsel**
>
>> a. **Treatment Is Substantially Likely To Restore The Defendant To Competency**

Treatment with antipsychotic medication is the accepted and appropriate treatment for an individual with the diagnosis of Delusion Disorder, Mixed Type. Report at 14, TR at 46. The Report explains that providing Mr. Orloski with intramuscular, long acting Haldol decanoate medication will have a substantially probability of restoring him to competency. Report at 13, 14; see Weston, 255 F.3d at 883 (crediting the district court's finding and the evidence in the record showing "a strong-likelihood exists that medication will enhance some of Weston's trial rights, particularly his right to consult and to assist in his defense") (citing United States v. Weston, 134 F.Supp.2d 115, 133 (D.D.C. 2001).

Expected efficacy in the case of Mr. Orloski should approach 80%. Report at 19, TR at 50, see Weston, 255 F.3d at 882 (finding a sufficient likelihood that antipsychotic medication would restore competency where the government presented evidence that such medication

mitigated symptoms for a least 70 percent of patients and the defendant's response might be higher). The Government does not need to demonstrate "100% probability" that the medication will restore competency. Id. at 882. Good outcome predictors for Mr. Orloski include primarily delusions with a paucity of deficit symptoms, lack of substance abuse, and no evidence of organicity. Report at 19, TR at 52.

The Report specifically explains that antipsychotic medication can produce beneficial clinical effects such as decreasing delusional beliefs, and these are the psychotic symptoms which render Mr. Orloski incompetent to stand trial. Report at 14. By decreasing delusional beliefs, the influence they have on decisions, judgments, and perceptions are decreased and, with time, eliminated. Report at 14. As a result, Mr. Orloski is anticipated to make reasonable, rational, and reality based decisions regarding the processing of his legal charges. Report at 14. In addition, antipsychotic medication can decrease agitation and increase one's ability to become appropriately focused on one's case and, consequently, improve the level of communication between Mr. Orloski and his attorney. Report at 14; see Weston, 225 F.3d at 882 (crediting the the district court's finding that "antipsychotic medication is the only therapeutic intervention available that could possibly improve Weston's symptom picture, lessen his delusions, and make him competent to stand trial") (citing Weston, 134 F.Supp.2d at 132).

        **b.**    **The Treatment Is Not Substantially Likely To Have Serious Side Effects Which Would Interfere With Mr. Orloski's Ability To Assist His Attorney In Conducting His Defense**

The side-effects of the antipsychotic medication, with appropriate clinical management, would be unlikely to interfere with Mr. Orloski's ability to assist counsel in his defense. Report at 19, TR at 49.

As with all medications, antipsychotic medication has side effects. Report at 16. A few of the side effects of the antipsychotic medications are serious and others are relatively benign and have no long term effects. Id. As a matter of course, these side effects are monitored and routinely managed by psychiatrists throughout the country in daily clinical practice. Id. The risks and benefits of the particular medication are considered prior to initiating treatment. Id. If serious side effects emerge, they are managed in a clinically appropriate manner. Id., see Weston, 255 F.3d at 885 (crediting the district court's finding and the evidence in the record showing "Weston's doctors can manage side effects in a number of ways" and concluding that "the possibility of side effects from anti-psychotic medication is undeniable, but the ability of Weston's treating physicians and the district court to respond to them substantially reduces the risk they pose to trial fairness.")

In particular, antipsychotic medication would be unlikely: to impair Mr. Orloski's ability to communicate, impair his ability to effectively react to and participate in courtroom proceedings, impair his ability to express emotions, or sedate him. TR at 50-51, see Sell, 539 U.S. at 185 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence . . .") (citing Riggins, 504 U.S. at 142-145 (Kennedy, J., concurring in judgment)).

### 3. Less Intrusive Alternatives To Medication Will Not Achieve The Same Results

Any alternative, less intrusive treatments are unlikely to achieve substantially the same

results of restoring Mr. Orloski to competency. As explained in the Report, Mr. Orloski is unlikely to improve in the foreseeable future without treatment with antipsychotic medication, which he is now refusing on a voluntary basis. Report at 16. In particular, without the benefit of medication, Mr. Orloski is substantially unlikely to attain the ability to fully appreciate the nature and consequences of the proceedings against him or to assist properly in his defense. Report at 13.

There is no evidence that psychotherapeutic techniques alone are effective alternatives for antipsychotic agents. Report at 16, TR at 8, 9, 39. First, Mr. Orloski does not have any insight or understanding that he has a mental illness. Id. He therefore does not believe that he is in need of treatment of any type and, consequently, he is unlikely to engage in any form of psychothereapy. Report at 16. Second, while there is evidence in the psychiatric literature that some forms of psychotherapy are beneficial to an individual with psychotic symptoms, such psychotherapy is as an adjunctive treatment to the antipsychotic agents to improve such issues as insight, compliance, or coping skills. Id.

### 4. Treatment With Antipsychotic Medications Is Medically Appropriate

As discussed above, the Report indicates that the standard and accepted treatment for anyone with the diagnosis of Delusional Disorder, Mixed Type would involve the prescription of antipsychotic medication. Report at 14. The Report further indicates that Mr. Orloski does not have any chronic medical conditions which would be adversely affected by the proposed treatment of antipsychotic medication and, consequently, administering the proposed treatment is medically and clinically appropriate. Report at 17.

The Report details that Mr. Orloski's individual treatment plan would be tailored to

appropriately address his refusal to comply with any oral psychotropic medication. Id. Because it would not be practical to administer a short-acting injectable medication on a daily basis, the Butner medical staff would rely on a long acting injectable antipsychotic. Id. These antipsychotics would include Haldol decanoate and Prolixin decanoate. Id. Prior to the administration of any of these long-acting medications, a test dose of the short acting formulation would be required for safety purposes to rule out unexpected allergic reactions. Id., TR at 57.

Dr. Cheltenham would choose to administer Haldol decanoate as the first line medication for a number of reasons. Report at 17. These reasons include that Haldol decanoate provides a more even absorption into the blood from the depot site in the muscle. Id. Dr. Cheltenham proposes that Mr. Orloski would initially be administered 100 mg of Haldol decanoate intramuscularly every two weeks over the first two months of treatment in order to hasten steady blood levels required for optimal therapeutic effects. Id. Thereafter, the dose would be administered every four weeks. Id.

Side effects of Haldol and Proxilin decanoate are most notable for movement disorder, including Parkinsonian effects, dystonic reactions, akathisia, and tardive dyskensia. Id. As set forth in the Report and discussed below, with the exception of tardive dyskinesia, these effects are reversible with discontinuation of the medication and are otherwise manageable. Report at 17-18, TR at 49.[5]

      **a.**    **Parkinsonian Effects**

---

[5] Notably, the Report explains that, if at any time Mr. Orloski voluntarily agreed to take an oral antipsychotic, he would be transitioned to one of the newer atypical antipsychotics, defined for the lower risk of movement disorders, such as Parkinsonism, dystonic reactions, and most importantly tardive dyskinesia. Report at 19, TR at 51.

Parkinsonian effects are most common, occurring in approximately 15% of patients, usually 5 to 90 days after the initiation of the medication. Report at 18. Symptoms include muscle stiffness, cogwheel rigidity, shuffling gait, stooped posture and a coarse tremor. Id. If Mr. Orloski were to develop this side effect, he would be administered 2 mg of Cogentin up to every eight hours, as needed, which usually provides immediate relief of these symptoms. Id. Side effects of Cogentin are dry mouth, blurred vision, dizziness, and constipation, and chronic administration of Cogentin may increase the risk of tardive dyskinesia. Id. Along with the administration of Cogentin, a dosage reduction of Haldol decanoate would be considered.

        **b.**        **Dystonic Reactions**

Dystonic reactions occur in approximately 10% of patients treated with either Haldol or Prolixin decanoate, and these reactions occur within the first few hours or days of treatment initiation. Id. Dystonic reactions consist of a slow, sustained muscular contraction or spasm that can result in an involuntary movement involving the neck, jaw, tongue, or the entire body. Id. This side effect is avoided by giving a dose of 2 mg of Cogentin intramuscularly during the first two weeks of the long acting Haldol or Prolixin administration. Id.

        **c.**        **Akathisia**

Akathisia is a subjective feeling of muscular discomfort that can cause the patient to be agitated, pace, stand and sit, and feel dysphoric. Id. This side effect can occur any time during treatment and is less frequent than Parkinsonism or dystonic reaction, but may be under diagnosed as psychosis, agitation or poor cooperation. Id. If Mr. Orloski were to develop akathisia, the dose of either Haldol or Prolixin decanoate would be reduced, with the possible temporary addition of Indera or Ativan. Inderal may cause dizziness, bradycardia, and dysphoria,

and Ativan may result in sedation and unsteadiness.

### d. Tardive dyskinesia

Tardive dyskensia is considered the most serious side effect due to possible irreversibility and incapacitation. Report at 18. This is a delayed effect of the typical antipsychotics such as Haldol and Prolixin which rarely occurs until after six months of treatment, but then occurs at an incidence of 4% per year, with a lifetime prevalence of approximately 30%. Report at 18. The likelihood that a patient will develop this side effect, which may not be dose related, increases over time. Id. This syndrome consists of involuntary, irregular combinations of writhing and jerking movements of the voluntary muscles of the head, limbs and/or trunk. Id. The severity of these movements range from minimal to grossly incapacitating. Id.

To address tardive dyskinesia, the medical approach would be prevention, diagnosis and management. Id. Following the initiation of treatment, tardive dyskinesia is monitored at each clinical contact and documented monthly with the use of the Abnormal Involuntary Movement Scale (AIMS). Id. Because there is no effective treatment for tardive dyskinesia, early intervention is imperative at the first signs of tardive dyskinesia, where discontinuation of the antipsychotic results in the reversal of tardive dyskinesia in 50% of the cases. Id.

The only established treatment for intractable tardive dyskinesia is discontinuation of the offending antipsychotic and switching to the atypical antipsychotic Clozaril. Id.

### CONCLUSION

For the foregoing reasons, the United States Attorney for the District of Columbia, respectfully requests that the Court order the defendant to submit to the administration of antipsychotic medications consistent with the Supreme Court's decision in Sell v. United States.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:             /s/               
OPHER SHWEIKI
Assistant United States Attorney
Bar No. 458776
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 353-8822
Opher.Shweiki@usdoj.gov