IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES** | ) |
| | ) |
| V. | ) Cr. No. 07-258-M-01 (JMF) |
| | ) |
| | ) |
| **CHRISTOPHER ORLOSKI** | ) |

**DEFENDANT'S BRIEF IN OPPOSITION TO
REQUEST TO INVOLUNTARILY MEDICATE HIM**

I.   **INTRODUCTION**

On May 27, 2007, according to the police, an officer conducting a security sweep at the Capitol found a water bottle containing a clear liquid near the Grotto area of the grounds. The words "for U.S. defense" were handwritten on the label and clear body of the bottle. There were also some papers found next to the bottle, one of which appeared to be a photocopy of keys associated with the Architect of the Capitol. That paper and others referred to the travel schedule of CSX trains and to Chlorine or the release of Cloreen (sic). The papers also included references to defendant Orloski. At about the same time, according to the police, a citizen discovered two envelopes near Grant's statue on the Capitol grounds. One envelope contained directions to the Grotto. The other contained, *inter alia*, a resume of Mr. Orloski, and references to the Virginia Tech shooting and forwarding the keys to an unnamed Islamic government.

On May 31, Mr. Orloski was found sleeping outside of Capitol grounds. He was interrogated and arrested, charged with knowingly conveying false or misleading information.

On June 5, 2007, the Court referred Mr. Orloski for a forensic screening, and, on June 8, referred him for a full evaluation. Since that referral, Mr. Orloski has been held at the Federal

Medical Center at Butner, North Carolina.

## II. THE MEDICAL EVALUATION

In a report dated November 19, 2007, the treatment team at Butner concluded that Mr. Orloski is not competent to proceed to trial.[1] The team reported that Mr. Orloski was uncommunicative, uncooperative, argumentative, and antagonistic. They also conclude that his belief system is delusional, including a belief in a grand conspiracy against him, and a belief that he is a covert operative. They also cite instances of aggressive behavior toward the staff and other patients.

The treatment team believes that Mr. Orloski's competency can be restored, and seeks permission to medicate him with psychotropic medications, as Mr. Orloski refuses to accept medication voluntarily, and the team concludes that he is mentally ill and delusional.

Significantly, however, the team also found that :

1) Mr. Orloski has sufficient factual knowledge of the proceedings against him;

2) Mr. Orloski understands plea options and the personnel involved in the judicial process.

The report notes that from 10 to 30% of persons diagnosed with schizophrenia will have "little or no response" to antipsychotic medications. Seventy percent of *first episode* patients show remission of psychotic symptoms and signs within three to four months, and 83% achieve remission within a year.

## III. THE *SELL* HEARING

---

[1] The report was made a part of the record as Government Exhibit 1 in the *Sell* hearing held by the Court on January 29, 2008.

A.    Testimony/Evidence

Based upon the request by hospital staff, the Court held a hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003). In *Sell*, noting prior decisions in *Washington v. Harper*, 494 U.S. 210 (1990), and *Riggins v. Nevada*, 504 U.S. 127 (1992) the Court stated:

> These two cases, *Harper* and *Riggins*, indicate that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important trial-related interests.

*Sell*, *supra*, at 179.

At the hearing, the medical team in essence reiterated the facts and conclusions of the written report of November, 2007. Dr. Pyant, the attending psychologist, and Dr. Cheltenham, the staff psychiatrist presented testimony in accordance with the report.

Defendant Orloski testified on his own behalf at the hearing, reiterating to the Court that he understood that he was charged with a criminal offense, and that he understood the parties to the process, including the Court, attorneys and other personnel. Tr. at 67. He also felt that he was able to assist his counsel in the preparation of his defense. Tr. at 67-68. He was also able to articulate to the Court his conditions of confinement and his daily routine, which includes exercise, reading, and cleaning. Tr. at 68-69.

B.    The Law Under *Sell*

Expanding on Harper and Riggins, the *Sell* Court held that in determining whether *important* (emphasis in original) government interests are at stake so as to justify involuntary medicating a

defendant, lower courts must consider the facts of the individual case, including whether the individual has been confined for a significant period of time. Here, for example, Mr. Orloski has been confined for over eight months. A very rough calculation of his guidelines, depending upon whether any enhancements apply, suggest a sentencing range of anywhere from 15 to 33 months.[2]

Secondly the lower court must conclude that the involuntary administration of medication will substantially likely render the defendant competent without side effects that will significantly interfere with his ability to assist counsel. The potential side effects of the medication are chronicled in the report. With respect to Haldol, the pychotropic of choice, side effects are reversible with the discontinuation of the medication, a result which seems to defeat the purpose of the involuntary medicating *ab initio*. Also, 15 percent of patients show Parkinsonian effects, which include muscle stiffness, rigidity, shuffling gait stooped posture, and a tremor. These conditions are not conducive to assisting counsel in the preparation of a defense. Moreover, treatment of these conditions with Cogentin also creates side effects, including blurred vision, dizziness, and constipation. Again, this case involves a bogus threat where no one was injured, and no hazardous material was utilized.

Thirdly, the lower court must find that the involuntarily medication procedure is necessary to further the governmental interests. If the court finds involuntary medication appropriate, it must also consider less intrusive procedures for administration, such as an order backed by contempt powers. The logic would seem to be that a defendant's cooperation, subject to the sword of contempt, may lessen any hostility or antagonism toward the provider and ease the process.

Finally, the lower court determines if the forced medication is medically appropriate. Again,

---

[2]This calculation is based upon a base offense level of twelve, with a possible enhancement of 4 points, and a criminal history category of III.

the levels of success and the side effects, which have been alluded to earlier, are paramount.

  C.  *Weston v. United States*

  At the end of the *Sell* hearing the Court asked the parties to address the impact of *Weston v. United States*, 347 U.S.App.D.C., 145, 255 F.3d 873 (D.C. Cir. 2001).

  *Weston*, decided before *Sell*, involved an individual who shot and killed two United States Capitol Police officers and seriously wounded a third. Defendant Weston was found incompetent to stand trial.[3] *See United States v. Weston*, 134 F.Supp2d 115 (D.D.C. 2001). Defendant Weston suffered from paranoid schizophrenia, and the severity of his symptoms prevented him from understanding the proceedings and assisting his counsel. *Weston*, 347 U.S.App.D.C. at 147, 255 F.3d at 875. At Butner, he was placed in solitary confinement because of his dangerousness. He refused medication. After administrative hearings and court hearings the Court ordered Mr. Weston forcibly medicated as it was "medically appropriate" and "essential for [Weston's] own safety or the safety of others." *United States v. Weston*, 69 F.Supp.2d 99, 118 (D.D.C. 1999), *reversed and remanded*, *United States v. Weston*, 340 U.S.App.D.C. 336, 206 F.3d 9 (D.C. Cir. 2000) *(Weston II)*. In reversing, the Circuit held that the record did not support a finding of dangerousness. On remand, the District Court held that Mr. Weston could be forcibly treated to control his dangerousness and that the government had an essential interest in bringing him to trial because of the serious and violent nature of the offense and because the victims were law enforcement officers. *Weston*, 134 F.Supp2d at 127, 131.

  On appeal, the Circuit affirmed. *United States v. Weston*, 347 U.S.App.D.C. 145, 255 F.3d

---

[3] A procedural history of defendant Weston's case may be found at *United States v. Weston*, 340 U.S.App.D.C. 336, 206 F.3d 9 (D.C. Cir. 2000), *reversing United States v. Weston*, 69 F.Supp.2d 99 (D.D.C. 1999).

873 (D.C. Cir. 2001). However, the Court again found no support for a finding of dangerousness. There is not dangerousness at play in Mr. Orloski's case, and the government appears not to make an argument pursuant to *Washington v. Harper*, 494 U.S. 210 (1990). With respect to the issue of restoring competence to stand trial the panel held that defendant Weston could be forcibly medicated if the government could prove the necessity to accomplish an essential state policy. *Weston*, 347 U.S.App.D.C. 153, 255 F.3d 152. However the panel stressed that nature and circumstances of the specific offense in reaching its conclusion, *to wit*: the killing of law enforcement officers in a public place where government conducts its duties. That case is not on all fours with that of Mr. Orloski. No one was injured in this case, and the "threat", if any, was quickly found to be bogus. Indeed the Circuit goes farther than Justice Breyer's later opinion in *Sell*. Where the Circuit allows for no consideration of length of confinement, Justice Breyer specifically notes this factor as a possible consideration. Where the Circuit concludes that medication would "more likely" improve Mr. Weston's ability to testify, 347 U.S.App.D.C. 156, 255 F.3d 256, Justice Breyer's opinion holds that the lower court must find that the administration of drugs is *substantially likely* to make him competent, and *substantially unlikely* to have side effects substantially interfering with his ability to assist counsel. 539 U.S. 181. (emphasis added).[4]

In short, it appears that the *Weston* decision is not on all fours with facts of the instant case, and that it also exceeds what *Sell* permits. Accordingly we respectfully submit that the focus should be on *Sell*.

For the reasons argued in this response, and any others that may appear to the Court,

---

[4]We would also note that it an open question as to whether the DC Jail or the CCF facility has the capability to monitor Mr. Orloski's condition for purposes of trial if he is indeed restored to competency.

6

defendant Orloski respectfully asks that the Court deny the request to involuntarily medicate him.

        Respectfully submitted,

        A.J. Kramer

        Federal Public Defender

By: _____/s/_____
        Shawn Moore
        Assistant Federal Public Defender
        Attorney for Christopher Orloski
        DC Bar #214171
        625 Indiana Avenue, NW, #550
        Washington, DC 20004
        202/208-7500
        Fax/208-7515 or 501-3928