**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

    v.                                                                                    Cr. No. 07-mj-258 (JMF)

**CHRISTOPER ORLOKSI,**

    **Defendant.**

## MEMORANDUM OPINION

### Findings of Fact

1.    On May 27, 2007, during a security sweep of the United States Capitol, United States Capitol Police found a water bottle, containing a clear liquid, near the grotto area on the Capitol Grounds. Written on the bottle were the words "for U.S. Defense."

2.    A Capitol police officer found nearby some 17 sheets of paper. Included in the stack of papers was a photocopy of three keys, two of which were identified as "Architect of the Capitol Medico keys." One was the master key for all telecommunications closets in the Senate Hart Office Building. There were also handwritten notes referring to the schedules of two CSX trains and items transported on those trains with a reference to "CHLORINE."

3.    Included among the papers was a print out of an email addressed to the Defense Intelligence Agency, threatening to release chlorine gas in Washington, D.C.

4.    On that same day, a citizen found two envelopes near Grant's statue on the Capitol Grounds and turned them over to a Capitol police officer. One contained a

directive to "Go to the Grotto fountain for the complete details on the U.S. Senate Thanks." Another envelope contained a letter addressed "To all in the family" and stated: "There is a reason why I captured the U.S. Senate's keys and gave them to the Islamic Republic." There was also a reference to "making the Seung-Hui Cho Virginia Tech event look like a cribling using a plaything."

5. The police secured the grotto area and the Hazardous Devices Unit identified the liquid in the water bottle as Windex, the window cleaner.

6. On May 31, 2007, the police found the defendant asleep on the Capitol grounds. He told the police that he had left the papers as a test for tourists.

7. The defendant was then arrested and charged with a violation of 18 U.S.C. § 1038,[1] which makes it a crime to (*inter alia*) threaten to use[,] any chemical weapon."

8. The defendant was admitted to the Mental Health Department of the Federal Medical Center in Butner, North Carolina ("Butner") on July 2, 2007, for a determination of his competency.

9. Since being admitted to Butner, he has "refused or restricted his participation in virtually all clinical contacts." Report of the Federal Medical Center, dated November 19, 2007 (hereafter "Rpt") at 5. He has also steadfastly refused to participate in the evaluation process and has been "uncooperative, guarded and self-righteous." Id.

10. The physicians at Butner have diagnosed the defendant as suffering from "Delusional Disorder, Mixed Type, (Grandiose, Persecutory)." Rpt at 10.

11. The defendant believes that he is a covert operative employed by the Defense Intelligence Agency. He explains that "he has been authorized to complete a

---

[1] All references to the United States Code are to the electronic versions in Westlaw and Lexis.

2

highly classified mission of such importance that its exposure would place the country in peril." Rpt at 12.

12. He views himself as above the law and does not believe that the court has any authority over him. Id. He believes that since he is a covert operative, acting in a government sanctioned capacity, he is exempt from legal proceedings. Id.

13. He has made it clear that that he does not believe that his attorney can or will defend him; instead, he believes that his attorney is part of the government conspiracy against him. Rpt at 13. He wishes to represent himself but believes that his case is "undefendable" because "orders have come down from the top." Id. He is certain that his lawyer is not out to help him but concerned only about his financial compensation and the maintenance of the lawyer's win-versus-loss record in court. Id.

14. The defendant's behavior and statements "clearly indicate Mr. Orloski has paranoid delusions which preclude him from rationally applying factual knowledge to his case." Rpt at 12.

15. There is a substantial probability that the defendant can be rendered competent if he is treated with psychotropic medication, but the defendant has refused to take any such medication. Rpt at 13.

16. Without such medication it is substantially unlikely that the defendant will ever become competent. Rpt at 13.

17. Treatment with such medication is the accepted and appropriate treatment for an individual with the diagnosis of Delusional Disorder, Mixed Type. Rpt at 17.

18. Psychiatric and psychological studies summarized in the report indicate that treatment with psychotropic medication is efficacious in restoring competency.

Rpt at 15.

19.  Other alternatives to such medication, such as psychotherapy, have little hope of success because the defendant lacks all insight into his mental illness. Rpt at 16.

20.  While there are potential side effects to the medication to be involuntarily administered, none would have any impact on the defendant's ability to communicate with his attorney or participate in the trial. Testimony of Mark Cheltenham, Transcript of hearing held on January 29, 2008 at 50.

21.  The physicians at Butner are hopeful, however, that after the defendant is treated involuntarily with Haldol, he will be sufficiently recovered to switch to another medication that has a lower risk of tardive dyskinesia. Id. at 51-52.

22.  The involuntary medication of the defendant will begin with the intramuscular administration of the 100 milligrams of the drug Haldol decanoate every two weeks in order to hasten steady blood levels required for optimal therapeutic effects. Rpt at 17.

23.  Thereafter, the dose would be administered every four weeks. Id.

24.  Administration of the Haldol will be monitored, and if the defendant were to show signs of Parkinsonian effects, he would be administered Cogentin which should provide immediate relief. Rpt at 18.  Any other side effects will be monitored and treated with other medications or the medication will be discontinued if necessary. Rpt at 18.

**Legal Analysis**

The government may administer antipsychotic drugs to render a mentally ill defendant competent to stand trial on serious criminal charges if:  (1) doing so advances important governmental interests to include bringing to trial an individual accused of a

serious crime and assuring him of a fair trial; (2) the medication is substantially likely to render the defendant competent and unlikely to have side effects that will interfere with the defendant's ability to assist counsel in conducting a defense; (3) alternative, less intrusive treatments are unlikely to achieve the same result; and (4) administration of the medication is medically appropriate. Sell v. United States, 539 U.S. 166, 180 (2003).

There is little quarrel by the defendant with the findings I have made that speak to the second through fourth factors. There is no alternative to the involuntary medication given the defendant's utter refusal to participate in any form of therapy and his grandiose, persecutory delusional system. The scientific research marshaled in the report indicates a sufficient likelihood of success to warrant the involuntary medication. The risk of side effects can be reduced to a tolerable level and the treatment of delusional disorder by the administration of psychotropic drugs is medically appropriate. Indeed, it is now the common course of psychiatric treatment for the illness from which the defendant suffers.

What divides the parties is their differing perceptions of whether involuntary medication is disproportionate to the defendant's crime. To the government, the defendant's bizarre threats to spread chlorine gas and his placing of what might have been a dangerous substance on the Capitol grounds render his crime a serious one, requiring that the government's interest in his punishment and isolation from the community be vindicated by his prosecution. To the defendant's counsel, the defendant's crime consists of leaving some pieces of paper, incoherent and highly reflective of his mental illness, on the ground next to a bottle that contained some window cleaner. Indeed, the defendant points out that his deprivation of liberty is about to exceed his

potential sentence so that any governmental interests in punishing him and isolating him from the community have already been vindicated.

A true analysis of the competing interests indicates, however, that the defendant and the government share an interest in restoring his competency as soon as possible and that interest can only be vindicated by his involuntary medication.

The government's interest in rendering the defendant competent is the interest defined in the Sell decision: to have the trial and proceed to a prompt adjudication of guilt or innocence. 539 U.S. at 180. In the federal system, the vast majority of the defendants plead guilty so, to speak more realistically, the government's interest is in having the defendant plead guilty to a negotiated plea bargain.

If the defendant is not involuntarily medicated, and the government can make a case for civil commitment, it can at least keep the defendant confined until he is pronounced no longer mentally ill or dangerous. 18 U.S.C. § 4246. At that point, the government can at least hope that the danger to the community that the defendant represents will be reduced to a tolerable level, particularly if the defendant, upon release from his civil commitment, complies with the medication regimen that restored his competency while hospitalized. While all too many mentally ill defendants do not comply with their medication regimen,[2] some do and there is therefore at least some hope that this defendant will comply and ultimately live a productive life, free of the mental illness that has apparently haunted him for a long time.

---

[2] Joseph B. Verrengia, Schizophrenics Often Stop Taking Medicine, Miami Herald, July 28, 1998 at 1. (study indicating that one half of schizophrenics stop taking their medications).

6

On the other hand, defendant has no interest in civil commitment, because the defendant runs the substantial risk that his civil commitment may at this point result in the deprivation of his liberty for a longer period of time than his potential sentence.

In this case, however, it appears that civil commitment may be problematic since the Report and the testimony indicate that defendant is not a threat to himself and it is uncertain that a court will conclude that he is a threat to others. The defendant's interest in not being involuntarily medicated is, at this point, simple: if he escapes involuntary medication, he regains his liberty since it is a given that he cannot be indefinitely deprived of his liberty because he is incompetent, even though he is mentally ill. <u>Jackson v. Indiana</u>, 406 U.S. 715 (1972). His interest therefore is, at first glance, in perfect conflict with the government; the government wants to see him detained as long as possible while he seeks to avoid the delay that will occur while he is involuntarily medicated. If the defendant is not involuntarily medicated, he will have a chance to simply go home.

While his counsel cannot make the argument since he is duty bound to fight for his client's freedom, the defendant actually has an interest equal to the government's in his being restored to competence. There is no indication of a defense to the charges and the likelihood of a plea of guilty is strong if the defendant's competency can be restored. His experienced counsel estimates a guideline range of 15 to 33 months if the defendant is convicted as charged. <u>Defendant's Brief in Opposition to Request to Involuntarily Medicate Him</u> at 4. There is nothing in this case to suggest at this point that a sentence within that range will not be given. Moreover, a plea bargain might further reduce the sentence to the point where a sentence of time served and supervised release would be a

7

realistic possibility. Thus, defendant has an interest in his becoming competent as soon as possible.

Furthermore, the record in this case, including his bizarre submissions to the Court itself, establishes to my satisfaction that his resistance to involuntary medication is not based on his concern about side effects or how his medicated condition might affect a jury. It is based instead on his delusional system that is paranoid in its ideation. Accordingly, the circle cannot be broken: the defendant resists involuntary medication because he is mentally ill and he will remain mentally ill until he is medicated.

I therefore conclude that in this case, where there is no certainty of the defendant's civil commitment and where his resistance to involuntary medication is based on a delusional system, he must be involuntarily medicated if there is to be any hope of a prompt resolution of this matter, which is in both parties' interests. This is not to say that involuntary medication is appropriate if the defendant is charged with a parking violation. There will always be a case where the defendant should not be involuntarily medicated because his crime cannot possibly be described as serious. In such a situation, involuntary medication, no matter how beneficial, is unavailable because the defendant's liberty interest trumps the government's interest in his continued detention while he is incompetent and involuntarily medicated.

I note in this context that I must categorize the defendant's crime as serious. Sell restricts the ability of the government to medicate a defendant involuntarily to serious cases.[3] With hindsight, of course, it is easy to say that defendant's crime amounted to

---

[3] In one case, the magistrate judge held that the misdemeanor of forcibly intimidating and interfering with an employee of the United States was not a serious crime. United States v. Evans, 293 F. Supp. 668 (W.D. Va. 2003). No good deed going unpunished, the

nothing more than his putting a bizarre note next to a water bottle. But, hindsight is always 20-20. Like it or not, the District of Columbia attracts seriously mentally ill people who in their paranoid delusions view themselves as victims of governmental "conspiracies" from which they seek relief by appearing at the White House, the Capitol, and, for that matter, the Courthouse. When the threat has dissipated, it is easy to accuse government officials of an overreaction. But, until it dissipates, the impact on the community can be terrifying. It cannot be said that there is such a disproportion between what the defendant did and involuntary medication that the government's request for involuntary medication is extreme and unwarranted.

    I will therefore order that the defendant be involuntarily medicated, but I will require the government, in consultation with the Federal Medical Center, to provide me with a detailed order that sets forth in detail the protocol the Medical Center plans to follow in medicating the defendant involuntarily. Such protocol shall be submitted to the Court within 10 days of the date of this Memorandum Opinion.

 

Dated: May 21, 2008　　　　　　　　　　　　　　　　/S/_____
　　　　　　　　　　　　　　　　　　　　　JOHN M. FACCIOLA
　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

---

defendant then threatened to kill the magistrate judge and the district judge concluded that threatening to kill a judicial officer is certainly a serious crime. United States v. Evans, No. 102-CR-136, 2004 WL 533473 (W.D. Va. Mar. 18, 2004), rev'd on other grounds, 404 F.3d 227 (4th Cir. 2005). In another case, however, the court concluded that entering the country illegally was not a serious crime. United States v. Barajas-Torres, No. 03-CR-2011, 2004 WL 1598914 (W.D. Tx. July 1, 2004).